## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**STEVEN HUFF, individually,**
**and on behalf of all those similarly situated,**

    **Plaintiff,**

                                    **Case No.: 6:19-cv-00861-RBD-DCI**

**v.**

**BOBCAT NORTH AMERICA, LLC,**
**d/b/a ORION WASTE SOLUTIONS,**
**BOBCAT DISPOSAL OF SARASOTA,**
**LLC, RUSSO AND SONS, LLC, M&MR**
**OPERATIONS, INC. formerly RUSSO**
**AND SONS, INC., MIKE RUSSO, and**
**MARILYN RUSSO,**

    **Defendants.**

_____/

## JOINT MOTION TO APPROVE SETTLEMENT
## AND INCORPORATED MEMORANDUM OF LAW

Representative Plaintiff, **STEVEN HUFF,** and the **OPT-IN PLAINTIFFS** (as identified

in Attachment A to the attached Settlement Agreement)(collectively, the "Settlement Collective"

or "Plaintiffs"), and Defendants, **BOBCAT NORTH AMERICA, LLC, BOBCAT DISPOSAL**

**OF SARASOTA, LLC and RUSSO AND SONS, LLC** ("Bobcat Defendants") and Defendants,

**M&MR OPERATIONS, INC. formerly RUSSO AND SONS, INC., MIKE RUSSO, and**

**MARILYN RUSSO** ("Russo Defendants ")(collectively "Defendants") hereby move this Court

for approval of the Parties' Settlement Agreement attached as Exhibit 1 ("Agreement")[1], resolving

their dispute regarding all claims held by Plaintiffs for unpaid overtime wages, liquidated damages,

and attorneys' fees and costs under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–19

---

[1] Any capitalized terms not defined herein have the meanings ascribed in the Settlement Agreement.

("FLSA") against Defendants, and dismissing the case with prejudice. This Honorable Court should grant the Parties' Motion because the settlement is a fair, adequate, and reasonable resolution of the Parties' *bona fide* dispute.

## BACKGROUND

### I.     OVERVIEW OF CLAIMS AND PROCEDURAL HISTORY

#### *The Lawsuit and Early Opt-Ins*

On May 6, 2019, Representative Plaintiff Steven Huff, on behalf of himself and similarly-situated drivers employed in Ocoee, Florida commenced this action by filing a complaint alleging violations of the FLSA ("the Lawsuit") by the Defendants. [Doc. 1.]  The Complaint alleges, in relevant part, that the Defendants violated the FLSA in two ways.  First, by a practice of rounding weekday timeclock clock-in entries to 6:00 a.m., and second, by a weekday automatic 30-minute lunch deduction. [Doc. 1, ¶¶45-55, 61] (the "Subject Practices").  Huff contended that the implementation of these Subject Practices violated the FLSA and caused Huff (and the other "similarly situated" drivers) to be paid less than what they were entitled to receive under the FLSA.

Prior to the Court's ruling on conditional certification, twelve (12) putative plaintiffs each filed a Consent to Join Collective Class ("Early Opt-Ins"). [Docs. 6-8, 10-15, 20, 31-32].  Another former employee filed a Consent to Join Collective Class [Doc. 36]; however, this person did not meet the eligibility criteria to participate in the class and is not included in the Settlement Collective and will be dismissed without prejudice by agreement of the Parties.[2]

---

[2] The Parties have determined that Nathaniel Rouch [Doc. 36-1] was not classified as a driver. However, a settlement offer and counter offer have been exchanged concerning Mr. Rouch, who is subject to a tolling agreement and will not be prejudiced by a dismissal *without* prejudice.

***Conditional Certification***

On December 12, 2019, the Representative Plaintiff filed a motion seeking conditional certification to proceed as a collective action on behalf of similarly-situated individuals. [Doc. 61]. Defendants vigorously disputed that conditional certification was appropriate. [Doc. 66]. Defendants argued, *inter alia,* that: 1) the Subject Practices alleged did not violate the FLSA; 2) the automatic lunch deduction was derived from federal DOT safety regulations that mandated a 30-minute break period be taken; 3) employees had a mechanism to report if they performed work during the 30-minute automatic lunch break; 4) employees were informed that they were not to perform work before 6:00 a.m.; 5) Defendants were not a common enterprise as the claims were framed in the Complaint; and 6) conditional certification was inappropriate and that decertification was likely given the predominance of individualized issues.

On March 31, 2020, the Court conditionally certified a class of persons who were: (1) employed as drivers by Bobcat North America, LLC, d/b/a Orion Waste Solutions, Bobcat Disposal of Sarasota, LLC, Russo and Sons, LLC, M&MR Operations, Inc. formerly Russo and Sons, Inc., Mike Russo or Marilyn Russo at the Ocoee, Florida location during the three years preceding March 8, 2019; (2) paid an hourly rate and (3) alleged unpaid overtime wages due to the Subject Practices. [Doc. 70].  The Conditional Certification Order also appointed Steven Huff as class representative, N. Ryan Labar and Scott C. Adams of LaBar & Adams, P.A. as Class Counsel, approved the proposed class notice and consent forms [Doc. 61-2 and 61-3], and established a filing deadline for consent-to-join forms of ninety-days after the notice and consent forms were served.  [Doc. 70, pp. 11-12].  Pursuant to the Court's Order, on April 15, 2020, Class Counsel sent court-approved notices to 111 putative class members that had not already joined the Lawsuit. An additional twenty-nine (29) putative class members timely returned consents to join the

Lawsuit which were filed with the Court ("Opt-Ins").  The Settlement Collective totals forty-two (42) Plaintiffs made up of the Representative Plaintiff, twelve (12) Early Opt-Ins and twenty-nine (29) Opt-Ins; all of which are listed in **Attachment A** to the Agreement (Exhibit 1).

### *Discovery and Early Negotiations*

Even prior to the actual filing of the Lawsuit, the Parties engaged in substantial communications and negotiations about the claims and defenses at issue.  The Parties attended and participated in good faith in a pre-suit mediation, which helped frame and narrow the issues in this case.  Although the parties did not settle at the pre-suit mediation, the Parties were able to set up a framework for a possible future settlement and extensively discussed the available records that would provide a basis for an analysis of the potential claims.  Even prior to the Lawsuit being filed, preliminary documents relating to the Representative Plaintiff were provided to Class Counsel.

Post-lawsuit, the Parties conducted extensive amounts of written discovery. The Defendants collectively produced over 24,000 pages of data and other records that were relevant to the core issues in the case including payroll and time records, time-stamped "Idle Time" reports (demonstrating when the trucks were idle during the day) and GPS reports. Those records resulted in both sides creating damage models that forced the other side to evaluate the true strengths and weaknesses of their respective factual and legal positions. Those models were exchanged, evaluated, critiqued and refined as more discovery was conducted and more information was exchanged by the Parties. Ultimately, the discovery conducted by the Parties revealed that all sides had significant risks and variability in potential outcomes both in terms of potential decertification and at trial.  Throughout the process the Parties have engaged in good faith arm's length settlement negotiations.

***Final Settlement Negotiations***

Given the *bona fide* factual and legal disputes that exist, the proposed settlement provides a fair and reasonable compromise; it affords class-wide relief to the collective without prioritizing a single theory or a subset of the collective. The proposed settlement was negotiated over a period of several months with Class Counsel keeping the Settlement Collective timely informed of the negotiations. The negotiations were focused both on the representations of the Settlement Collective and the data in the relevant documentation.

The proposed settlement further eliminates the inherent risks and expense the Parties would incur if this litigation were to continue through resolution on the merits. Finally, although each side remains confident that they could succeed on the merits, there is no guarantee as to the outcome for either, and this proposed settlement allows the Parties to eliminate individualized and expensive fact discovery that might result in decertification, a lengthy trial with an uncertain outcome, and appeals. The Parties' proposed settlement affords the collective class-wide recovery and allows every eligible member of the conditionally certified class the opportunity to benefit from the settlement.

Defendants believe that the claims asserted by the Plaintiffs are without merit. Defendants have vigorously contested the claims but believe that further litigation would likely be protracted and expensive and the outcome would be uncertain. Substantial amount of time, energy, and other resources have been spent, and absent settlement, will continue to be committed to the defense of the claims asserted in this litigation. In light of these realities, Defendants believe that settlement is the best way to resolve the dispute among the Parties while minimizing further expenditures. Specifically, Defendants maintain that they properly paid the Plaintiffs under the FLSA or that they had no legal obligation to do so. Defendants also have asserted and continue to assert that

they are not joint employers of Plaintiffs. Nonetheless, Defendants have concluded that further litigation of this Lawsuit would be protracted, distracting, and expensive, and that it is desirable that the Lawsuit be fully and finally settled and dismissed in the manner and upon the terms and conditions set forth in this Agreement.

This settlement constitutes the Parties' good-faith compromise of claims as to which there is a *bona fide* dispute regarding potential liability and damages based upon Plaintiffs' assertion of claims under the FLSA. In addition, the settlement provides compensation for *all weeks* worked during the claim period at the applicable overtime rates; even for hours worked that might have otherwise been paid at a straight-time rate under state or local law. Thus, the settlement resolves unpaid wages for all hours worked but not paid as a result of the alleged Subject Practices. Without admitting or conceding any liability or responsibility for damages, Defendants have agreed to settle the Lawsuit on the terms and conditions set forth in the proposed settlement to avoid the burden, expense, inconvenience, and uncertainty of continuing litigation. Each Plaintiff in the Settlement Collective has individually approved the proposed settlement because they believe it is a fair compromise of disputed claims.

## II.    SUMMARY OF THE SETTLEMENT TERMS

This settlement covers the Representative Plaintiff, the Early Opt-Ins and the Opt-Ins for a total of 42 Plaintiffs in the Settlement Collective. These Plaintiffs are current and former non-exempt employees of Defendants who worked as drivers between March 8, 2016 and March 8, 2019 at the Ocoee, Florida location. In exchange for a full and final release of claims and conditioned on Court approval of the Agreement, Defendants have agreed to pay a total settlement amount of $541,093.13 ("Gross Settlement Amount") to the Settlement Collective and to Plaintiffs' attorneys. *See* Exhibit 1. The Bobcat Defendants will pay $311,876.13 and the Russo

Defendants will pay $229,217.00 of the Gross Settlement Amount. This distribution among Defendants was based upon the relative weeks each Plaintiff worked for either the Bobcat or Russo Defendants.

The Parties have agreed that the settlement payment to each Plaintiff will be based upon the number of weeks each Settlement Collective Plaintiff worked during the applicable FLSA statute of limitations period, the number of automatic lunch deductions and the number of times the timesheet reflected an edit ("E") on a morning clock-in to 6:00 a.m. during that same period.[3] The individual calculations were based upon an analysis of individual time records, GPS reports, time-stamped Idle Time Reports (which showed the start time of certain trucks), interrogatories, testimony, paper records, and representations from the Plaintiffs.

Under the proposed Settlement, each eligible Plaintiff will receive a payment that takes into account and adjusts for the following factors to ensure that the compromise is fair as to each and every individual Plaintiff: 1) weeks worked during the class period, 2) each Plaintiff's average overtime rate of pay during their employment during the class period; 3) the actual number of adjusted 6 a.m. clock-in entries during the class period if that data is available; 4) the actual number of automatic lunch deductions that were applied during the class period if that data is available; and 5) a compilation of testimony and hard data sources that assign an appropriate weight to each lunch-deduction and 6 a.m. adjustment.

---

[3] Prior to October 2018, Defendants maintained a work rule that work began strictly at 6:00 a.m. and no work was to be performed prior to that start time. Any clock-ins prior to 6:00 a.m. were "edited" to reflect a 6:00 a.m. clock-in and the time records reflected "E" to show it was edited but the actual clock-in time was not reflected and cannot be obtained. Defendants maintain that no work was performed (or even able to be performed) prior to 6:00 a.m.; however, Plaintiffs dispute this claim. The practice of changing the clock-in time stopped on October 14, 2018.

Each and every eligible Plaintiff has reviewed the Settlement Agreement, the payouts under the proposed settlement, and has approved the Agreement for themselves and as a whole. *See* Composite Exhibit 2. The Parties submit that the payment of these amounts will fairly compensate Plaintiffs for the claims set forth in the Complaint.

### Automatic Lunch Deductions

To calculate "Lunch" damages, the Parties took the total number of thirty-minute lunch deductions[4] for each Plaintiff, multiplied that number by either .5 or .6, and then multiplied the product again by 2. The multiplier (or percentage) for lunch deductions (.5 or .6) is based upon individual Plaintiff's representations regarding the average number of times that individual routinely worked through the automatic lunch period. Doubling the formula accounts for liquidated damages. The product is then converted to money damages based upon each Plaintiff's actual overtime rate.

### Early Clock-Ins

To calculate "Early Clock-In" damages, the Parties multiplied the total number of clock adjustments (which were reflected on timesheets as "E") for each applicable Plaintiff[5] by either 7, 11, 20 or 30 minutes. The number of minutes assigned to each Plaintiff is based upon data including truck GPS records, time stamped "Idle Time" records, route sheets, individual Plaintiff's representations, and time records (post-October 14, 2018) which reflected actual clock-in times.

---

[4] Thirty-minute automatic lunch deductions were routinely made for drivers during weekdays and the records identified when these deductions occurred. Defendants maintain that there was a mechanism for drivers to report when they worked for all or part of this deducted time; however, Plaintiffs dispute this claim.

[5] Most, but not all, of the Plaintiffs claim to have worked prior to 6:00 a.m. during the time period up to October 14, 2018. Discovery revealed the Plaintiffs fell into groups which ranged from those who regularly arrived early (the "30 minute" group) to those who never came to work before 6 a.m. The Parties agreed on a "E" range up to 30 minutes, with most falling into the 7, 11, or 20-minute groups.

The product of the foregoing was then doubled for liquidated damages. The resulting time is then converted to money damages based upon each Plaintiff's actual overtime rate.

### *The Russo Defendants Calculation*

The Russo Defendants' contribution to the Gross Settlement Amount is calculated using the number of weeks, if any, each Plaintiff worked for the Russo Defendants prior to May 2017 when Bobcat purchased the assets of Russo & Sons, Inc. Because the documentation regarding the individual lunch deductions and/or 6:00 a.m. clock adjustments was missing or incomplete for the period prior to May 2017, the amount paid by the Russo Defendants is calculated based upon a weekly average of the settlement amount paid by the Bobcat Defendants (to each applicable Plaintiff), which is then multiplied by the number of weeks each applicable Plaintiff worked during the claim period for Russo Defendants. Damages are doubled for liquidated damages.

### *Plaintiffs Emmett Lawson, Darren Paulk, and Thomas Mason*

Three Plaintiffs, Emmett Lawson, Darren Paulk and Thomas Mason worked only for the Russo Defendants. There was no documentation for these individuals regarding their lunch deductions and/or 6:00 a.m. clock adjustments and therefore an average weekly payment amount calculated from the totals of the other Plaintiffs' payments was used for their calculations. These three Plaintiffs are also receiving an equal sum of liquidated damages like the other Plaintiffs.

### *Payment to Plaintiffs and Attorneys' Fees and Costs*

Under the settlement, each Plaintiff will receive back-pay wages properly taxed with deductions for any additional applicable taxes or withholdings. Corresponding IRS W-2 Forms will be issued for such payments. Defendants shall separately pay the employer's share of any payroll taxes and remit these along with the amounts withheld from Plaintiffs' back-pay wages to the IRS. The Plaintiff will also receive an equal sum of liquidated damages, and corresponding

IRS 1099 Forms will be issued for such payments.  Defendant shall not withhold anything from this portion of the Settlement Payment.

The Parties also separately negotiated fair and reasonable attorneys' fees based on the amount of time expended and the complexity of the litigation.  Counsel for Plaintiffs will be paid $185,000.00 for attorneys' fees and costs. The Parties separately negotiated the fees and costs and after the amounts to the Plaintiffs were agreed upon.  Furthermore, the fees and costs do not impact and were negotiated without regard to the amounts paid to Plaintiffs. The Parties agree that the attorneys' fees and expenses are a fair and reasonable amount and were necessary for the prosecution of this action.  Defendants do not oppose Class Counsel's recovery of these fees or expenses and do not object to the reasonableness of Plaintiffs' fees and expenses or that they were fair, reasonable, and necessary for the prosecution of this action.  An IRS 1099 Form for the attorneys' fees and costs payment shall be issued *only* to Class Counsel.

## ARGUMENT

### I.    Standard for Approval of FLSA Collective Actions

When parties settle or compromise claims for back wages under the FLSA, they must seek court approval for the proposed settlement.  *Dyer v. M&M Asphalt Maintenance Inc.*, Case 6:15-cv-00959-RBD-KRS, Doc. 223 (M.D. Fla. May 12, 2017)(*citing Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352 (11th Cir. 1982)).  A federal trial court "may enter a stipulated judgment after scrutinizing the settlement for fairness."  *Id.* (citing *Lynn's Food Stores*, 679 F.2d at 1353.) The relevant inquiry is whether the proposed settlement "constitutes a fair and reasonable compromise of a *bona fide* FLSA dispute." *Crabtree v. Volkert, Inc.*, No. 11-0529-WS-B, 2013 WL 593500, 2013 U.S. Dist. LEXIS at *3 (S.D. Ala. Feb. 14, 2013).

When determining whether to approve a FLSA settlement between private parties, those federal courts "should be mindful of the strong presumption in favor of finding a settlement fair." *Id. (quoting Bennett v. D.L.S. Marketing, LLC, 2009 WL 1309758, *2 (M.D. Fla. May 7, 2009)); .* Where "the parties are represented by competent counsel in an adversary context, the settlement they reach will, almost by definition, be reasonable." *Id.* (*quoting Bonetti v. Embarq Mgmt. Co.*, 715 F. Supp. 2d 1222, 1227 (M.D. Fla. 2009)) (quotation marks omitted); *see also Norris v. Lake Conway Landscaping of Orlando, Inc.*, Case No.: 14-cv-1512-ORL-37KRS, 2015 WL 3632314 (M.D. Fla. June 10, 2015).

### A.    A *Bona Fide* Dispute Exists Over Liability and Damages

A *bona fide* dispute exists in this case. Defendants have vigorously opposed the allegations in this case through motions to dismiss and oppositions to conditional certification.  Defendants asserted, and continue to assert, that Defendants had reasonable grounds to believe they were in full compliance with the FLSA at all times and acted in good faith and not in violation—willful or otherwise—of the FLSA at any time relevant to this action. In fact, it is undisputed that Defendants paid overtime pay to Plaintiffs.  Defendants deny that they knew or should have known that any Plaintiff worked "off the clock" either before the mandated 6:00 a.m. start time or during the 30-minute automatic lunch deduction period. *See, e.g., White v Baptist Memorial Health Care Corp.*, 699 F. 3d 869 (6th Cir. 2012), *cert. denied*, 134 S.Ct. 296 (2013).  Moreover, there is dispute about whether the alleged unpaid hours would be overtime hours and the amount, if any, of such overtime hours. *See Buntin v. Square Foot Mgmt. Co., LLC*, 6:14-CV-1394-ORL-37, 2015 WL 3407866, at *2 (M.D. Fla. May 27, 2015).  In *Buntin*, this Honorable Court found that representations regarding the dispute over hours actually worked and risks of protracted litigation were "sufficient information for the Court to determine that the compromise pertained to a bona fide dispute over FLSA provisions." *Id.* (*citing Lynn's Food*, 679 F.2d at 1355).

The Parties both agree that there is substantial risk for both sides. The total settlement amount reflects a reasonable compromise of the Plaintiffs' claimed damages and confers substantial benefits to the Plaintiffs. Although the Parties believe in the merits of their respective claims and defenses, given the time and expense associated with continued litigation, the Parties agree that a compromise is appropriate. They desire to resolve this case by way of a negotiated settlement payment by Defendants to avoid the time and expense inherent in continued litigation and scores of individual trials. *See Lynn's Food Stores*, 679 F.2d at 1354 ("Thus, when the parties [to the litigation] submit a settlement to the court for approval, the settlement is more likely to reflect a reasonable compromise of disputed issues than a mere waiver of statutory rights brought about by an employer's overreaching.").

**B.      The Proposed Settlement is Fair and Reasonable.**

Courts consider several factors before approving a settlement as fair, reasonable, and adequate under the FLSA, including:  the risk of fraud or collusion; the complexity, expense, and likely duration of the litigation; the amount of discovery completed; the likelihood of success on the merits, range of possible recovery; and opinions of counsel. *See Leverso v. SouthTrust Bank of Ala., Nat'l Assoc.,* 18 F.3d 1527, 1531 n.6 (11th Cir. 1994).

**1.      There is No Evidence of Fraud or Collusion.**

As discussed above, the Parties reached the Agreement following 1) a full day pre-suit mediation[6], 2) motion disputes over dismissal and conditional certification, 3) extensive discovery and 4) months-long negotiations that were predicated upon detailed and specific modeling and analysis.  The Parties dispute was and is *bona fide*.  Plaintiffs remain confident they can eventually

---

[6] A Board-Certified Labor & Employment lawyer mediated the case over a full day, and then continued to assist following the unsuccessful initial mediation. The same Mediator was set to conduct the second full day of mediation, pursuant to this Court's order, on November 16, 2020.

prevail on their claims, and Defendants continue vigorously to dispute any liability to Plaintiffs. A *bona fide* dispute has been found in similar circumstances in past cases. *Whitley v. Mercedes-Benz U.S. Int'l, Inc.,* 7:15-CV-1403-SLB, 2016 WL 107704, at *2 (N.D. Ala. Jan. 11, 2016)("The court finds that there are bona fide disputes as to FLSA coverage for unpaid meal periods[.]"). "Typically, courts regard the adversarial nature of a litigated FLSA case to be an adequate indicator of the fairness of the settlement." *Simmons v. Mathis Tire & Auto Serv.*, No. 13-2875-STA-tmp, 2015 WL 5008220, 2015 U.S. Dist. LEXIS 114008, at *2 (W.D. Tenn. Aug. 20, 2015) (citing *Lynn's Food Stores*, 679 F.2d at 1353–54)). There is no risk of fraud or collusion where adversarial parties strongly contest the underlying issues. *Id.* The Parties were represented by counsel experienced in wage-and-hour law, exchanged meaningful damage calculations and assumptions, and analyzed the available data. Despite engaging in a full day pre-suit mediation, the Parties were able to settle this action only after filing a lawsuit, engaging in extensive discovery, motion practice, and other activities illustrating the adversarial nature of the litigation.

## 2. The Complexity, Expense, and Likely Duration of the Litigation Supports Settlement.

Had the Parties not reached the Agreement, the continued litigation would have been long, complex, and expensive. While the Parties have conducted significant discovery, there was still costly discovery left to be completed, including expert witness discovery, depositions and discovery responses (both interrogatories and document production) from the Plaintiffs. Absent settlement, Defendants would have moved for decertification, requiring several weeks of extensive briefing, and fully intended to contest this matter through trial. Additionally, the legal issues in this case related to liability, particularly in terms of the joint enterprise allegations in the Lawsuit which have been hotly contested at every stage, are complex. Settling now rather than litigating these complex liability issues benefits the Parties and the Proposed Settlement Collective.

### 3.    The Discovery Conducted Supports the Settlement Terms.

As discussed above, significant discovery was conducted prior to settlement.  Defendants

provided to Class Counsel data, documentation and information for the Parties to value the case

accurately and to settle it fairly and responsibly. Prior to this lawsuit being filed and in conjunction

with the pre-suit efforts to mediate and resolve this case, Defendants voluntarily produced to Class

Counsel (1) time and payroll records for the Representative Plaintiff, (2) electronically stored

information ("ESI") showing clock in data, (3) other records which pertained to the claims in this

action.

After this action was filed, Defendants have answered and produced documents and ESI

responsive to hundreds of requests propounded by Plaintiff.  The Defendant(s) have answered

interrogatories and produced 24,000 pages of time clock records, payroll records, GPS logs, Idle

Time Reports, dump tickets, route sheets, asset purchase documents, and scores of other

documents and information.  Using all available data and relevant documents, Defendants and

Plaintiffs have both calculated and exchanged extensive damage models, together with detailed

explanations of how they made such calculations, and the precise theories on which their claims

rested.  Both sides have reviewed, analyzed, and discussed those models, in order to ascertain the

risks of this litigation.  Those discussions produced some areas of agreement, while highlighting

the fact that this case had enough risk and uncertainty for both sides that would support a fair and

equitable compromise solution.

### 4.    Litigation Risks Weigh In Favor of Settlement.

The Parties feel they have strong positions and that they will ultimately disprove the other's

position.  The Parties recognize, however, that continued litigation, by its very nature, presents

certain risks and significant expenses for the Parties.  As one Court recognized:

> What the parties have reached, then, is a classic compromise.  Plaintiffs accepted less money in settlement than they would have received if they had prevailed on all matters at trial, in exchange for the certainty of receiving payment now without the burden of litigating [defendant's] multiple colorable defenses that, if successful, could have reduced or even negated plaintiffs' recovery.

*Warren v. Cook Sales, Inc.,* No. 15-0603-WS-M, 2017 WL 325829, at *16 (S.D. Ala. Jan. 23, 2017).

Plaintiffs understand that they face a risk of losing a significant portion of their claimed damages should this case survive decertification and proceed to trial.  Plaintiff's best-case scenarios are based upon their own personal estimates of time lost on an average weekly basis to the Subject Practices.  In part, this is because the time records during the class period are incomplete, or were overwritten as to the clock-in time when the 6:00 a.m. adjustments were made.[7]  But there is a significant amount of data that supports a much lower damages figure depending upon the date and data available for that time period.  *Crabtree*, 2013 WL 593500, 2013 U.S. Dist. LEXIS, at *10–11 ("[G]iven the substantial legal and factual obstacles at trial, the substantial uncertainty of plaintiffs prevailing on their FLSA claims, and the considerable delay that plaintiffs would have likely experienced in receiving payment even if they did prevail at trial, settlement of such causes of action in the agreed-upon amounts appears entirely reasonable.").  The Defendants also disputed that the three-year statute of limitations was appropriate or that liquidated damages would be warranted. [Doc. 56, Aff. Def. ¶¶ 6 -7; Doc. 57 Aff. Def. ¶¶ 5-6].  Furthermore, Defendants vigorously opposed collective treatment.  There is no guarantee that even though a collective action was conditionally certified that the case would ultimately be tried as a

---

[7]In other words, while the Parties could see the number of 6:00 a.m. adjusted entries, it was not possible to see what the original clock-in value was for those entries, meaning that the start time for each Plaintiff would have to be established through testimony and other indirect evidence (such as an idle time report that shows when a truck was first started in the morning).

collective.  In sum, this settlement provides all applicable class members back wages and liquidated damages for a full three years.

Defendants likewise faced significant litigation risks and expenses.  To complete discovery and prepare an appropriate a motion for decertification as Defendants intended would result in the expenditure of significant attorneys' fees as well as tens of thousands of dollars in litigation costs for court reporters, travel, ESI vendors and the like.  Furthermore, if Plaintiffs succeeded at trial, Defendants faced a potential increased exposure, not only from damages, but also the increased attorneys' fees.  Perhaps even more importantly to Defendants are the costs of continued litigation to their business operations.  The law of scarcity dictates that the time Defendants and their employees devote to defending this litigation would come at some cost to their business.[8] Defendants prefer to resolve the dispute so that they can focus, without distraction, on running their businesses. Both Parties faced litigation risks on key issues in this case and Defendants faced the reality that protracted litigation could be harmful to their businesses.

### 5.    The Range of Possible Recovery Supports the Settlement

The individual settlement amounts that each Plaintiff will receive fall squarely within the possible range of recovery.  By way of example, and as previously noted, the twelve (12) Early Opt-Ins joined the litigation prior to conditional certification. [Docs. 6-8, 10-15, 20, 31-32].  As a result, these Plaintiffs along with Mr. Huff answered the Court's Interrogatories. [Docs. 39-50, 52].  Without including liquidated damages (which doubles the amounts), the Early Opt-Ins averaged more than 60% of their claimed back wage damages.  Moreover, while the Interrogatories were based on best recollections and some payroll records, the later calculations were made using ESI, including GPS and Idle Time records (which captured drivers' trucks' movements). For

---

[8]By resolving this case, the Defendants are also able to resolve issues that might have otherwise been litigated between them, such as issues related to claims of indemnification.

example, pinpoint data for many of the days in the claim period was able to be extracted- down to when a particular truck was powered up, moved, or stopped. Handwritten route sheets (filled out by the Drivers themselves) that reflected when work commenced for the day were also produced during discovery. The extrinsic data revealed that initial recollections of lost wages may have been overestimated.

Although the remainder of the class did not answer the Court's Interrogatories, Plaintiffs' Counsel performed extensive analysis and damages modeling using the foregoing data. The class as a whole average approximately 70% of the estimated wages, not including the liquidated damages recovery, which doubles each of their payouts. These figures reflect a reasonable compromise and fall in line with typical FLSA settlements that avert unreasonable risk.

### 6.    Opinions of Counsel

Counsel for the Parties are experienced in FLSA cases. It is the opinion of Counsel as reflected in this Motion, that this settlement reflects a reasonable compromise and guarantees an outcome that provides a benefit to all Parties. The resolution of this litigation will, among other things: (i) provide back pay and liquidated damages to the Plaintiffs for a full three-year period; (ii) ensure certainty for all concerned without additional delay; and (iii) obviate the need for additional litigation. The Agreement simultaneously benefits the Parties and serves the public interest by ensuring compensation to the class members and resolving this federal dispute with efficiency. *See Edwards v. City of Mansfield*, No. 1:15-CV-959, 2016 U.S. Dist. LEXIS 64159, at *10 (N.D. Ohio May 16, 2016) ("[A]pproval of a fair and reasonable agreement promotes the public's interest in encouraging settlement of litigation.").

### 7.    Miscellaneous Factors

Additionally, because a plaintiff may only compromise FLSA claims on the basis of a "dispute over FLSA provisions," certain concessions, such as pervasive general releases are reviewed for their impact on a settlement's fairness, especially when they appear gratuitous or to be the result of overreaching by an employer. *See Bright v. Mental Health Res. Ctr., Inc.,* No. 3:10–cv–427–37TEM, 2012 WL 868804, (M.D. Fla. Mar. 14, 2012) 2012)("Employers cannot use the settlement of FLSA claims to extract a general release of claims before paying over the wages").  The FLSA Settlement Agreement does not contain a pervasive general release, though it does release related unpaid wage claims under state law.  As discussed, this is because the Parties included in the settlement *all weeks* worked by each Plaintiff within the claim period that were affected by the Subject Practices- even weeks that the payroll did not necessarily reflect a full forty (40) hour work week.  These weeks were rare, so instead of parsing out those weeks that a straight time calculation might arguably be warranted, the Parties agreed that the Plaintiffs would receive overtime wages plus liquidated damages for *all* weeks.  Therefore, the Plaintiffs are also releasing state and local claims related to these Subject Practices.  Narrow releases such as this are approved as fair and reasonable.  *Plazas v. Dr. Phillips Ctr. for Performing Arts, Inc.,* 6-18-CV-392-Orl-37TBS, 2018 WL 3432739, at *3 (M.D. Fla. June 29, 2018)(Judge Smith found fair a release for all unpaid wage claims under FLSA "or any similar state or local law"), *report and recommendation adopted*, 2018 WL 3428155 (M.D. Fla. July 16, 2018)(Dalton, J.); *See also Daniels v. Sharyanah, Inc.,* 6:17-CV-365-Orl-40DCI, 2017 WL 2805716, at *2 (M.D. Fla. June 9, 2017)(Judge Irick found that a release for claims "arising out of or related to the payment of wages during employment" was sufficiently limited), *report and recommendation adopted*, 2017 WL 2800224 (M.D. Fla. June 28, 2017) (Byron, J.).

Additionally, in a separate agreement, Huff individually released the Defendants for Non-

FLSA claims (general release). *See* Exhibit 3.  This release was negotiated separately and had no

impact on the FLSA Settlement Agreement or the formulas used to determine FLSA damages.[9] It

is independent of the FLSA Settlement and supported by additional consideration of $5,000 from

the Bobcat Defendants and $5,000 from the Russo Defendants. While general releases that are

supported by independent consideration are approved in FLSA settlements,[10] courts have also

found that there is no need to rule on the validity of non-FLSA general release agreements. *Roman*

*v. FSC Clearwater*, LLC, 6:16-cv-969-Orl-41DCI, 2017 WL 1552304, at *n1 (M.D. Fla. May 1,

2017)(court declined to express opinion on validity of general release agreement for which

additional consideration was paid)(Mendoza, J.); *See also Sibauste v. Forge Motor Sport, Inc.,*

Case No: 6:17-cv-2069-Orl-DCI, at *n1 (M.D. Fla. May 17, 2018)(court approved FLSA

---

[9] The individual release allows Huff and the Defendants' to move on with their respective trajectories with complete finality. The consideration therein adequately compensates Huff for the release of liability and provides him with freedom to explore future job prospects without retribution (neutral reference).  Likewise, Defendants are free to grow and expand in their own right without being unfairly disparaged.  However, nothing in the release acts to suppress information or the Parties' right to discuss the FLSA case.

[10] *Goodson v. OS Rest. Services, LLC,* 5:17-cv-10-Oc-RBD-PRL, 2018 WL 1701985, at *1 (M.D. Fla. Mar. 21, 2018) ($100 additional consideration for pervasive release did not undermine fairness of FLSA settlement), *report and recommendation adopted,* 2018 WL 1695406 (M.D. Fla. Apr. 6, 2018) (Dalton, J.); *Reed v. City of Apopka,* Case No: 6:17-cv-1163-Orl-40-DCI, 2017 WL 11025813, at *2 (M.D. Fla. Dec. 19, 2017) ($100.00 as additional consideration for a general release did not affect the fairness of the compromised FLSA settlements)(Irick, J), *report and recommendation adopted*, 2017 WL 11025765 (M.D. Fla. Dec. 22, 2017)(Byron, J.); *O'Neill v. Speedster Services, LLC*, 6:18-cv-120-ORL-37GJK, 2018 WL 4956775, at *4 (M.D. Fla. Sept. 11, 2018) ($350 as separate consideration for a general release allowed for approval of agreement)(Kelly, J.), *report and recommendation adopted*, 2018 WL 4953239 (M.D. Fla. Oct. 12, 2018)(Dalton, J.); *Martinez v. Ambi Paving, LLC*, 6:18-cv-737-Orl-37GJK, 2018 WL 5003754, at *3 (M.D. Fla. Oct. 11, 2018)(additional $100 in consideration for the release of retaliation claims not pleaded was sufficient)(Kelly. J.), *report and recommendation adopted,* 2018 WL 4963697 (M.D. Fla. Oct. 15, 2018)(Dalton, J.); *Singh v. Petersen Dean Roofing & Solar Sys., Inc.*, 6:17-cv-1110-Orl-41DCI, 2018 WL 3235572, at *1 (M.D. Fla. June 6, 2018) ($300.00 in exchange for a general release was sufficient)(Irick, J.), *report and recommendation adopted as modified*, 2018 WL 3219410 (M.D. Fla. July 2, 2018)(Mendoza, J.).

settlement without "passing judgment on the enforceability of any of the provisions unrelated to the settlement of Plaintiff's FLSA claim, such as the general release and confidentiality provision for which separate consideration was paid.")(Irick, J.). Thus, to the extent it is not necessary, the Parties do not seek separate approval of the Non-FLSA release and they respectfully submit that this does not impact the fairness of the FLSA Settlement Agreement.  Furthermore, all Opt-In Plaintiffs reviewed Huff's individual release and understand that it only applies to Huff. *See* Composite Exhibit 2.

### C. The FLSA Supports the Negotiated Fees and Costs in the Proposed Settlement.

The FLSA provides "[t]hat the court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the Defendants, and costs of the action."   29 U.S.C. § 216(b). Counsel for Parties stipulate that the amount negotiated as attorneys' fees and costs is fair and reasonable, and that Plaintiffs accept this amount in full satisfaction of the attorneys' fees and costs incurred.

The Parties agreed to the Plaintiffs' attorneys' fees and costs separately and without consideration to the amount paid to the Plaintiffs, and the attorneys' fees and costs will be paid separately from Plaintiffs' recovery. Where the parties negotiate attorney's fees separately from the amount of the FLSA settlement itself, the court need not undertake a lodestar review of the attorney's fees for reasonableness. *Bonetti*, 715 F. Supp. 2d at 1228. This Honorable Court applies *Bonetti* and has stated that the fairness and reasonableness of attorneys' fees is established when the Parties separately negotiate the claim for attorneys' fees and nothing in the record indicates that the Plaintiff's recovery would be adversely affected by the amount paid to counsel. *Buntin,* 2015 WL 3407866 *4.  Here, the Plaintiffs' damages were calculated using the formulas discussed,

and the fees were separately negotiated based on time expended- which the Parties agree was necessary for the prosecution of this action.

## II.    CONCLUSION

The Parties' proposed settlement represents an arm's-length negotiation by competent counsel.  It provides relief to Plaintiffs and eliminates the inherent risks both sides would bear if this litigation were to continue.  For the foregoing reasons, the Parties respectfully request that this Court enter an order:

1.    Granting the Joint Motion;

2.    Approving the FLSA Settlement Agreement and the attorneys' fees and costs;

3.    Dismissing this case with prejudice with respect to the Settlement Collective;

4.    Dismissing Plaintiff, Nathaniel Rouch, without prejudice;

5.    Finding that each party shall be responsible for their own attorneys' fees and costs, except as stated in the Agreement; and

6.    Retaining jurisdiction over the Parties to the Agreement for the purposes of interpretation, compliance, and enforcement of the Agreement and the Agreed Order of Dismissal with Prejudice.

Dated: November 9, 2020.                          Respectfully submitted,

**LABAR & ADAMS, P.A.**                           **BAKER, DONELSON, BEARMAN,
                                                  CALDWELL & BERKOWITZ**

By: */s/ Ryan LaBar*
N. Ryan LaBar, Esq.                               By: */s/ Dena H. Sokolow*_____
Florida Bar No.: 10535                            Dena H. Sokolow
Email: rlabar@labaradams.com                      Florida Bar No.: 0030856
Scott C. Adams, Esq.                              Email: dsokolow@bakerdonelson.com
Email: sadams@labaradams.com                      101 North Monroe Street, Suite 925
2300 East Concord Street                          Tallahassee, Florida 32301
Orlando, Florida 32803                            *Attorneys for Bobcat Defendants*
Phone: 407.835.8968
*Attorneys for Plaintiffs*

21

**NELSON MULLINS BROAD AND CASSEL**

By: */s/ Shaina Stahl*
Shaina Stahl
Florida Bar No.: 77643
Email: shaina.stahl@nelsonmullins.com
390 N. Orange Ave., Ste 400
Orlando, FL 32801
Phone: 407.839.4237
Fax: 407.425.8377
*Attorneys for Russo Defendants*